JOYCE R. BRANDA
Acting Assistant Attorney General
JONATHAN F. OLIN
MICHAEL S. BLUME
PATRICK R. RUNKLE
United States Department of Justice, Civil Division
      P.O. Box 386
      Washington, D.C. 20044
      Telephone:  (202) 532-4723
      Facsimile:  (202) 514-8742
      Email:     Patrick.R.Runkle@usdoj.gov

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. 14-cv-9734 |
| ) | |
| Plaintiff, ) | COMPLAINT FOR |
| ) | PERMANENT INJUNCTIVE |
| v. ) | RELIEF |
| ) | |
| HEALTH ONE PHARMACEUTICALS, ) | |
| INC., a California corporation; and ) | |
| RICHARD S. YEH, an individual, ) | [21 U.S.C. § 332(a)] |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

Plaintiff, the United States of America, by its undersigned counsel, and on behalf of the United States Food and Drug Administration ("FDA"), respectfully represents to this Court as follows:

      1.     This statutory injunction proceeding is brought under the Federal Food,

Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 332(a), and the equitable authority of this Court, to permanently enjoin Health One Pharmaceuticals, Inc., a corporation, and Richard S. Yeh, an individual, (collectively, "Defendants") from:

A.   Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1);

B.   Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements) that are misbranded within the meaning of 21 U.S.C. § 343;

C.   Violating 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that are held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1);

D.   Violating 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that are held for sale after shipment of one or more of their components in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 343;

E.   Violating 21 U.S.C. § 331(d) by introducing or delivering for

introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i); and

F.      Violating 21 U.S.C. § 331(k) by causing articles of drug that are held for sale after shipment of one or more of their components in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352(f)(1).

2.      This Court has jurisdiction over the subject matter and all parties to this action under 28 U.S.C. §§ 1331, 1337, and 1345, and 21 U.S.C. § 332(a).

3.      Venue in this district is proper under 28 U.S.C. §§ 1391(b) and (c).

## **Defendants**

4.      Defendant Health One Pharmaceuticals, Inc., is incorporated under the laws of the state of California.   Health One Pharmaceuticals manufactures, prepares, packs, labels, holds, and distributes dietary supplements and drugs. Health One Pharmaceuticals does business at 13260 East Temple Avenue, City of Industry, California, (the "facility") within the jurisdiction of this court.

5.      Defendant Richard S. Yeh is the president and owner of Health One Pharmaceuticals.   Mr. Yeh is the most responsible person at the firm.   He has ultimate authority over all of the firm's operations, including, but not limited to, product quality, financial decisions, hiring and firing personnel, and product sales.

Defendant Richard S. Yeh performs his duties at Health One Pharmaceuticals,

13260 East Temple Avenue, City of Industry, California, within the jurisdiction of

this court.

6.     Defendants have been and are now engaged in the business of

manufacturing, preparing, packing, labeling, holding, and distributing:

A.     Dietary supplements, within the meaning of 21 U.S.C. § 321(ff),

and their components.   Except for purposes of 21 U.S.C. §§ 321(g) and 350f, a

dietary supplement is deemed to be a food within the meaning of Act.   21 U.S.C.

§ 321(ff); and

B.     Products that meet the definition of drug under the Act, 21

U.S.C. § 321(g)(1), in that their labels contain claims that establish that the products

are intended for use in the cure, mitigation, treatment, and/or prevention of disease

("drug claims").

7.     Defendants are contract manufacturers of numerous products that are

distributed under their customers' brand names.

8.     Defendants manufacture their products using components shipped to

them by suppliers that obtain the components from locations outside the state of

California, including China and Singapore.   Defendants distribute their products to

locations outside the state of California, such as Tennessee.   Defendants also

distribute their products to customers in California who then distribute the products

to locations outside the state of California, including Florida.

## **Defendants' Violations of the Act**

### *Dietary Supplement Adulteration*

9.     The Act requires dietary supplement manufacturers to operate in compliance with current good manufacturing practice for dietary supplements ("Dietary Supplement CGMP").   21 U.S.C. § 342(g)(1).   Manufacturing according to Dietary Supplement CGMP means that the manufacturing process incorporates a set of controls in its design and production processes to assure a finished product of acceptable, predictable, and reliable quality.   Dietary supplements not manufactured, prepared, packed, and held in conformance with Dietary Supplement CGMP are deemed to be adulterated.   21 U.S.C. § 342(g)(1). The Dietary Supplement CGMP regulations are set forth at 21 C.F.R. Part 111.

10.     FDA inspected Defendants' facility on March 4-6, 10, and 14, 2014. That inspection established that the dietary supplements Defendants manufacture and distribute are adulterated within the meaning of 21 U.S.C. § 342(g)(1), in that they are prepared, packed, or held in a manner that does not conform to Dietary Supplement CGMP.   FDA investigators documented many significant deviations from Dietary Supplement CGMP, which include, but are not limited to, the following:

A.     Failure to conduct at least one appropriate test or examination to

verify the identity of every component that is a dietary ingredient before using such component, as required by 21 C.F.R. § 111.75(a)(1)(i);

B.      Failure to establish an identity specification for each component used in the manufacture of a dietary supplement, as required by 21 C.F.R. § 111.70(b)(1);

C.      Failure to establish specifications for each component to ensure that the finished dietary supplements manufactured using the component meet their specifications for purity, strength, composition, and quality, as required by 21 C.F.R. §§ 111.70(b)(2), (b)(3);

D.      Failure to determine whether component specifications that must be established in accordance with 21 C.F.R. § 111.70(b)(2) are met before using such component, as required by 21 C.F.R. § 111.75(a)(2);

E.      Failure to establish product specifications for the identity and purity of finished dietary supplement batches, as required by 21 C.F.R. § 111.70(e);

F.      Failure to conduct tests or examinations on their dietary supplements to verify that all finished batches meet product specifications for identity, purity, strength, and composition, as required by 21 C.F.R. § 111.75(c);

G.      Failure to have quality control operations for reviewing and approving all master manufacturing records and batch production records, as required by 21 C.F.R. §§ 111.123(a)(1), (a)(2), and to make and keep documentation

of the review and approval of those records, as required by 21 C.F.R. § 111.140(b); and

   H. Failure to have quality control operations for conducting material review and making disposition decisions in accordance with 21 C.F.R. § 111.113, as required by 21 C.F.R. § 111.123(a)(4), and to make and keep documentation of any material review and disposition decision, as required by 21 C.F.R. § 111.140(b).

11. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1), in that they have been prepared, packed, or held under conditions that do not meet Dietary Supplement CGMP, 21 C.F.R. Part 111.

12. Defendants violate 21 U.S.C. § 331(k) by causing the adulteration, within the meaning of 21 U.S.C. § 342(g)(1), of articles of food (dietary supplements) while such articles are held for sale after shipment of one or more of their components in interstate commerce.

### *Dietary Supplement Misbranding*

13. The Act deems a dietary supplement to be misbranded unless:

   A. In the case of a dietary supplement that contains two or more ingredients, its label bears the common or usual name of each ingredient, as required

by 21 U.S.C. § 343(i)(2) and 21 C.F.R. §§ 101.4(a), (g);

       B.    In the case of a dietary supplement that contains an herb or other botanical, its label or labeling identifies the part of the plant (e.g., root, leaves) from which the ingredient is derived, as required by 21 U.S.C. § 343(s)(2)(C) and 21 C.F.R. § 101.4(h)(1);

       C.    Its label or labeling bears nutrition information that provides: (1) the serving size in the manner described in 21 U.S.C. § 343(q)(1)(A) and 21 C.F.R. §§ 101.9(b), 101.12; and (2) the number of servings or other units of measure per container, as required by 21 U.S.C. § 343(q)(1)(B) and 21 C.F.R. § 101.36(b)(1)(ii);

       D.    Its label or labeling bears nutrition information required by 21 U.S.C. §§ 343(q)(1), (q)(2) in the manner specified by regulation, namely a "Supplement Facts" panel, as required by 21 U.S.C. § 343(q)(5)(F) and 21 C.F.R. § 101.36;

       E.    If it is a dietary supplement in package form, its label bears the place of business (city, state, ZIP) of the manufacturer, packer, or distributor, as required by 21 U.S.C. § 343(e)(1) and 21 C.F.R. §§ 101.5(a), (d); and

       F.    If it is a dietary supplement marketed in the United States, the label includes a domestic address or domestic telephone number through which the responsible person (as described in 21 U.S.C. § 379aa-1) may receive a report of a

serious adverse event with the product, as required by 21 U.S.C. § 343(y).

14.    During inspections in March 2014 (discussed in paragraph 10 above) and on April 8-11, 16-17, 29, and May 3 and 7, 2013 (discussed in paragraph 33 below), FDA investigators collected a variety of product labels that Defendants affix to their dietary supplements.   FDA evaluated the labels and determined that Defendants cause certain dietary supplements to be misbranded within the meaning of 21 U.S.C. § 343 in several ways, including but not limited to, the following:

A.    *Cancer support formula*, a Dr. Zhang's Formula Herbalmax product, bears a label that does not:   (1) list the common or usual names of all product ingredients, namely the capsule ingredients; (2) identify the part of the plant from which a botanical dietary ingredient (e.g., Astragalus membranaceus) in the product is derived; (3) bear nutrition information required by regulation, namely a Supplement Facts panel; (4) bear the place of business (city, state, ZIP) of the manufacturer, packer, or distributor; and (5) include a domestic address or domestic telephone number through which the responsible person (as described in 21 U.S.C. § 379aa-1) may receive a report of a serious adverse event with the product;

B.    *uDiabetes Clear*, a UFresh Center product, bears a label that does not:   (1) list the common or usual names of all product ingredients, namely the capsule ingredients; (2) identify the part of the plant from which a botanical dietary ingredient (e.g., Radix puerariae lobatae) in the product is derived; and (3) bear the

place of business (city, state, ZIP) of the manufacturer, packer, or distributor;

        C.   *Anti-u Allergies*, a UFresh Center product, bears a label that does not:   (1) list the common or usual names of all product ingredients, namely the capsule ingredients and magnesium stearate, an excipient; (2) identify the part of the plant from which a botanical dietary ingredient (e.g., Angelica) in the product is derived; and (3) bear the place of business (city, state, ZIP) of the manufacturer, packer, or distributor;

        D.   *Bone Essence*, a Best in Nature product, bears a label that does not:   (1) list the common or usual names of all product ingredients, namely the capsule ingredients; and (2) include a domestic address or domestic telephone number through which the responsible person (as described in 21 U.S.C. § 379aa-1) may receive a report of a serious adverse event with the product;

        E.   *Flexlyn*, a Princess Lifestyle product, bears a label that:   (1) does not include a domestic address or domestic telephone number through which the responsible person (as described in 21 U.S.C. § 379aa-1) may receive a report of a serious adverse event with the product; and (2) incorrectly declares the product's serving size; and

        F.   *Femanol*, a MedCo South product, bears a label that does not: (1) include a domestic address or domestic telephone number through which the responsible person (as described in 21 U.S.C. § 379aa-1) may receive a report of a

serious adverse event with the product; and (2) list the servings per container under the serving size on the nutrition label or include this information as part of the declaration of the net quantity of contents.

15.     Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce articles of food (dietary supplements) that are misbranded within the meaning of 21 U.S.C. § 343.

16.     Defendants also violate 21 U.S.C. § 331(k) by causing the misbranding, within the meaning of 21 U.S.C. § 343, of articles of food (dietary supplements) while such articles are held for sale after shipment of one or more of their components in interstate commerce.

### *Unapproved New Drugs and Misbranded Drugs*

17.     The Act's definition of drug includes products that are "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" in humans.   21 U.S.C. § 321(g)(1)(B).

18.     Because a product's intended use determines whether it is a drug, a dietary supplement may also meet the Act's drug definition if it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease.   See 21 U.S.C. § 321(ff) (providing that a dietary supplement shall be deemed to be a food within the meaning of Act, "[e]xcept for purposes of . . . [21 U.S.C. § 321(g), the Act's drug definition]").

19.    Several products described in paragraph 14, namely Cancer support

formula, uDiabetes Clear, Anti-u Allergies, and Bone Essence, are drugs within the

meaning of the Act because their labels contain drug claims.   For example:

A.    The name "Cancer support formula" is a drug claim because it

indicates that the product is to be used for treating or mitigating cancer;

B.     The name "uDiabetes Clear" is a drug claim because it indicates

that the product can prevent, cure, mitigate, or treat diabetes.   The uDiabetes Clear

label contains other drug claims relating to diabetes, namely that the product "May

regulate blood sugar" and "May prevent diabetes complications;

C.    The name "Anti-u Allergies" is a drug claim because it indicates

that the product can prevent, cure, mitigate, or treat allergies.   Additionally, the

Anti-u Allergies label represents that the product "[i]mprove[s] the symptoms of

pollen allergy including continuous sneezes, running nose, nasal congestion, itchy

nose, eyes and throat, red and swelling eyes, weeping, cough, short of breath,

dizziness and headache, etc.," which also constitute drug claims; and

D.    The label for Bone Essence contains drug claims that promote

the product for use in treating and mitigating joint swelling, inflammation, and pain,

and link these claims to specific ingredients:   Kolla2® plus

methylsulfonylmethane, respectively, "increase[s] joint mobility and flexibility"

and "may relief [sic] pain and stiffness, and reduce swelling and inflammation."

20.     Because the claims (described in paragraph 19 above) for Cancer support formula, uDiabetes Clear, Anti-u Allergies, and Bone Essence demonstrate that these products are intended for the cure, mitigation, treatment, and/or prevention of disease, they are drugs within the meaning of the Act, 21 U.S.C. § 321(g)(1)(B).

21.     Any drug that is a "new drug" under the Act may not be introduced or delivered for introduction into interstate commerce unless FDA has approved a new drug application or abbreviated new drug application for that drug, or the drug is exempt from approval under an investigational new drug application.   See 21 U.S.C. §§ 355(a), (b), (i), and (j).

22.     A "new drug" is defined as any drug "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."   21 U.S.C. § 321(p)(1).   For a product to be deemed "generally recognized as safe and effective" ("GRAS/E"), it must have substantial evidence of safety and effectiveness or, if it is an over-the-counter ("OTC") drug, it must comply with a monograph established by FDA regulation.   See 21 U.S.C. § 355(d); 21 C.F.R. § 330.1.

23.     Defendants' drugs, Cancer support formula, uDiabetes Clear, Anti-u

Allergies, and Bone Essence, lack substantial evidence of safety and effectiveness. There are no published adequate and well-controlled investigations or any other scientific literature demonstrating that Defendants' drugs are GRAS/E for any use and, therefore, qualified experts cannot come to a consensus of opinion concerning the effectiveness of these products.   Cancer support formula, uDiabetes Clear, Anti-u Allergies, and Bone Essence, are not GRAS/E.

24.   FDA has established by regulation that certain OTC drugs are GRAS/E and can be marketed without the need for FDA approval of a new drug application or an abbreviated new drug application.   21 C.F.R. § 330.1.   An OTC monograph establishes particular conditions for classes of OTC drugs, including active ingredient and labeling requirements specifying indications, warnings, and directions for use for the drug.   Any OTC drug that does not strictly conform to each manufacturing and labeling condition contained in an applicable monograph is not considered to be GRAS/E.   See 21 C.F.R. § 330.10(b).

25.   Defendants label Anti-u Allergies with claims that the product "[i]mprove[s] the symptoms of pollen allergy including continuous sneezes, running nose, nasal congestion, itchy nose, eyes and throat, red and swelling eyes . . . ." These claims cause Anti-u Allergies to be subject to the OTC monograph covering allergy drugs, 21 C.F.R. Part 341 ("Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use").

26.     Anti-u Allergies is neither formulated nor labeled in conformance with the allergy monograph.   For example, Anti-u Allergies is labeled as containing Magnolia Flower, Licorice, Siler, Angelica, and Cnidium, but none of these ingredients is permissible under the allergy monograph.   21 C.F.R. §§ 341.12 (permissible antihistamine active ingredients) and 341.20 (permissible nasal decongestant active ingredients); 21 C.F.R. §§ 341.72 (labeling of antihistamine drug products) and 341.80 (labeling of nasal decongestant drug products). Accordingly, Anti-u Allergies does not comply with the allergy monograph (or any other OTC monograph) and, therefore, is not deemed GRAS/E by regulation.

27.     FDA searched its records and found no new drug applications, abbreviated new drug applications, or investigational new drug applications for Defendants' products.   Therefore, Defendants' Cancer support formula, uDiabetes Clear, Anti-u Allergies, and Bone Essence are unapproved new drugs within the meaning of the Act, 21 U.S.C. § 355(a).

28.     Defendants violate 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i).

29.     A drug is misbranded within the meaning of 21 U.S.C. § 352(f)(1) if its

labeling fails to bear "adequate directions for use" and it does not fall within a regulatory exemption from that requirement.   FDA has defined "adequate directions for use" as "directions under which the layman can use a drug safely and for the purpose for which it is intended."   21 C.F.R. § 201.5(a).

30.   It is not possible to write adequate directions for use for Defendants' drugs because such directions—including indications, contraindications, dosages, routes of administration, warnings, side effects, and necessary collateral measures—are premised on animal and clinical data derived from extensive, scientifically controlled testing.

31.   As noted in paragraph 23 above, there are no well-controlled clinical test data for Defendants' drugs.   Consequently, adequate directions under which a layman can safely use Defendants' drugs cannot be written.   Moreover, because they are unapproved new drugs, Defendants' drugs are not exempt from the requirement for adequate directions for use.   21 C.F.R. §§ 201.100(c)(2), 201.115. Therefore, Cancer support formula, uDiabetes Clear, Anti-u Allergies, and Bone Essence are misbranded drugs under 21 U.S.C. § 352(f)(1).

32.   Defendants violate 21 U.S.C. § 331(k) by causing articles of drug that Defendants hold for sale after shipment of one or more of their components in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352(f)(1).

## **Previous Violations**

33.    Defendants have previously violated the Act.   Several of the Dietary

Supplement CGMP deviations observed during the most recent inspection

(described in paragraph 10 above) are the same as, or similar to, those observed by

FDA investigators during a previous inspection of Defendants' facility on April

8-11, 16-17, 29, and May 3 and 7, 2013.   For example, FDA investigators

documented Defendants' failure to conduct at least one appropriate test or

examination to verify the identity of every component that is a dietary ingredient

before using such component, as required by 21 C.F.R. § 111.75(a)(1)(i) (also noted

in paragraph 10(A) above).   FDA investigators also documented Defendants'

failure to determine whether component specifications that must be established in

accordance with 21 C.F.R. § 111.70(b)(2) are met before using such component, as

required by 21 C.F.R. § 111.75(a)(2) (also noted in paragraph 10(D) above).   In

addition, FDA investigators documented Defendants' failure to verify that all

finished batches of dietary supplements meet product specifications for identity,

purity, strength, and composition, as required by 21 C.F.R. § 111.75(c) (also noted

in paragraph 10(F) above).   Further, FDA investigators documented the following

deviations, all of which were subsequently observed during the March 2014

inspection at Defendants' facility:   failure to establish an identity specification for

each component used in the manufacture of a dietary supplement; failure to establish

specifications for each component to ensure that the finished dietary supplements manufactured using the component meet their specifications for purity, strength, composition, and quality; failure to establish product specifications for the identity and purity of finished dietary supplement batches; failure to have quality control operations for the review and approval of all master manufacturing records and batch production records, and to make and keep documentation of the review and approval of those records; and failure to have quality control operations for conducting material review and making disposition decisions in accordance with 21 C.F.R. § 111.113, and to make and keep documentation of any material review and disposition decision.

34.   FDA also inspected Defendants' facility on September 14, 16, 19, 21-22, and October 5, 2011, and documented the following deficiencies, all of which were subsequently observed during FDA's April/May 2013 and March 2014 inspections:   failure to conduct at least one appropriate test or examination to verify the identity of every component that is a dietary ingredient before using such component; failure to determine whether component specifications that must be established in accordance with 21 C.F.R. § 111.70(b)(2) are met before using such component; failure to verify that all finished batches of dietary supplements meet product specifications for identity, purity, strength, and composition; failure to establish specifications for each component to ensure that the finished dietary

supplements manufactured using the component meet their specifications for purity, strength, composition, and quality; failure to establish product specifications for the identity and purity of finished dietary supplement batches; and failure to have quality control operations for the review and approval of all master manufacturing records and batch production records, and to make and keep documentation of the review and approval of those records.

35.    FDA has warned Defendants about their ongoing Dietary Supplement CGMP violations.   At the close of the March 2014 inspection, FDA investigators issued a List of Inspectional Observations ("Form FDA-483") to, and discussed each of the observed deviations with, Defendant Yeh.   FDA investigators also issued a Form FDA-483 to Defendant Yeh at the close of the April/May 2013 and the September/October 2011 inspections and discussed each observation with him. After every inspection, Defendant Yeh or the firm's management responded to FDA in writing, promising to take corrective action to ensure that Defendants would come into compliance with Dietary Supplement CGMP.

36.    During the April/May 2013 and September/October 2011 inspections, an FDA investigator informed Defendant Yeh that his product labels bear claims not permitted for dietary supplements, such as claims that the products can be used to treat or prevent cancer, diabetes, or allergies.

37.    During the April/May 2013 and September/October 2011 inspections,

an FDA investigator spoke with Defendant Yeh about several labeling

discrepancies, namely that certain ingredients listed in a product formulation were

not listed on the product label.

38.    During the April/May 2013 inspection, an FDA investigator informed

Defendant Yeh that several product labels did not meet labeling requirements

because they did not include a domestic address or telephone number for reporting

adverse event experiences.

39.    When discussing Defendants' labeling deficiencies during the

April/May 2013 inspection, Defendant Yeh told the FDA investigator that he cannot

ask his customers to correct the product labels that they supply to him because label

changes would cost his customers too much money.

40.    Following the September/October 2011 inspection, FDA issued a

Warning Letter to Defendants dated March 28, 2012, detailing violations of the

Dietary Supplement CGMP regulations observed during the inspection.   Some of

the CGMP violations described in the letter are the same as, or similar to, the

violations FDA observed in the April/May 2013 inspection.   The Warning Letter

emphasized the serious nature of the violations.   The Warning Letter also stated that

it was Defendants' responsibility to ensure compliance with the Act and its

implementing regulations and that failure to take prompt action to correct the

violations may result in legal action, including injunction.

41.     The firm's management responded in writing to the Warning Letter with promises to correct Defendants' Dietary Supplement CGMP violations. However, Defendants either did not follow through on those promises to correct or failed to fully correct the Dietary Supplement CGMP violations, as shown by the FDA investigators' observation and documentation of ongoing, significant CGMP deficiencies during the April/May 2013.   In response to the CGMP deficiencies observed during the 2013 inspection, the firm's management again responded in writing with similar promises to take corrective action.   Once more, Defendants failed to come into compliance with Dietary Supplement CGMP requirements, as FDA documented during the March 2014 inspection at Defendants' facility.

42.     Based on the foregoing, Plaintiff believes that, unless restrained by this Court, Defendants will continue to violate the Act in the manner set forth above. WHEREFORE, Plaintiff respectfully requests that the Court:

I.     Order that Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, cease receiving, manufacturing, preparing, packing, labeling, holding, or distributing dietary supplements, unless and until:

A.     Defendants' methods, facilities, and controls used to receive, manufacture, prepare, pack, label, hold, and distribute dietary supplements are

established, operated, and administered in conformity with Dietary Supplement CGMP and the Act, in a manner that has been found acceptable by FDA;

B.    Defendants' dietary supplement labeling complies with 21 U.S.C. § 343 and applicable regulations, in a manner that has been found acceptable by FDA; and

C.    Defendants' labeling does not contain claims that cause any dietary supplement that Defendants manufacture, prepare, pack, label, hold, or distribute to meet the Act's definition of a drug, 21 U.S.C. § 321(g)(1)(B), unless the product is the subject of an approved new drug application or abbreviated new drug application, or is exempt from approval under an investigational new drug application, 21 U.S.C. §§ 355(a), (b), (i), and (j).

II.    Order that Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, be permanently restrained and enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done any of the following acts:

A.    Violating 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing to be introduced or delivered or introduction, into interstate commerce articles of food (including but not limited to dietary supplements and their components) that are adulterated within the meaning of 21 U.S.C.

§ 342(g)(1);

B.     Violating 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing to be introduced or delivered or introduction, into interstate commerce articles of food (including but not limited to dietary supplements and their components) that are misbranded within the meaning of 21 U.S.C.   § 343;

C.     Violating 21 U.S.C. § 331(k), by causing articles of food (including but not limited to dietary supplements and their components) that are held for sale after shipment of one or more of their components in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1);

D.     Violating 21 U.S.C. § 331(k), by causing articles of food (including but not limited to dietary supplements and their components) that are held for sale after shipment of one or more of their components in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 343;

E.     Violating 21 U.S.C. § 331(d), by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i); and

F.     Violating 21 U.S.C. § 331(k), by causing articles of drug held for sale after shipment of one or more of their components in interstate commerce to

become misbranded within the meaning of 21 U.S.C. § 352(f)(1).

III.    Order that FDA be authorized pursuant to this injunction to inspect Defendants' place(s) of business and all records relating to the receipt, manufacture, preparing, packing, labeling, holding, and distribution of all of Defendants' products to ensure continuing compliance with the terms of the injunction, the costs of such inspections to be borne by Defendants at the rates prevailing at the time the inspections are accomplished; and

IV.    Order that Plaintiff be awarded costs incurred in pursuing this action, including the costs of investigation to date, and such other equitable relief as the Court deems just and proper.

DATED this 19th day of December, 2014.

Respectfully submitted,

FOR PLAINTIFF
THE UNITED STATES OF AMERICA:

JOYCE R. BRANDA
Acting Assistant Attorney General
JONATHAN F. OLIN
Deputy Assistant Attorney General
MICHAEL S. BLUME
Director
Consumer Protection Branch

By: s/ Patrick R. Runkle
PATRICK R. RUNKLE
Trial Attorney, Consumer Protection Branch
Civil Division
United States Department of Justice
P.O. Box 386
Washington, D.C.   20044
Telephone: 202-532-4723
Facsimile: 202-514-8742
Email: patrick.r.runkle@usdoj.gov

OF COUNSEL:

WILLIAM B. SCHULTZ
General Counsel

ELIZABETH H. DICKINSON
Chief Counsel
Food and Drug Division
ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

CLAUDIA J. ZUCKERMAN
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4550
Silver Spring, MD 20993-0002
301-796-8609